IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>JOEL BERNARD FROST,<br><br>　　　　　　　　　　Debtor(s). | CASE NO. BK19-41945<br><br>CHAPTER 13 |
| F & M BANK,<br><br>　　　　　　　　　　Plaintiff(s)<br>　vs.<br><br>JOEL BERNARD FROST,<br><br>　　　　　　　　　　Defendants(s). | ADV. NO. A19-4054-TLS<br><br><br><br>ORDER |

　　　　This matter is before the court on the plaintiff's motion for summary judgment (Fil. No. 14) and resistance by the defendant (Fil. No. 21). Matthew V. Rusch represents the plaintiff, and John D. Rouse represents the defendant. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

　　　　The motion is denied.

　　　　F & M Bank filed this adversary complaint to except a debt from discharge under 11 U.S.C. § 523(a)(2). The debtor operated two welding businesses in Falls City, Nebraska: K & F Welding, LLC, and Frost-Tec Welding, Manufacturing, and Fabrication, LLC. In 2018, he obtained loans of approximately $170,000 from F & M Bank for Frost-Tec. In return, he gave the bank a security interest in Frost-Tec's property, allegedly assuring the bank it would have a first-priority lien. The bank alleges the debtor subsequently executed backdated documents to provide security interests to others without the bank's knowledge, and failed to disclose that some of the collateral belonged to K & F and had already been pledged to another lender. The bank claims it would not have provided the loans or extended credit to Frost-Tec but for the debtor's representations regarding the collateral available to the bank, and the debt should not be discharged under § 523(a)(2)(A) and (B).

　　　　The debtor asserts he did not intend to defraud the bank and that the lien priority problem arose from a misunderstanding. Specifically, the debtor intended Frost-Tec to be a successor to K & F and had enlisted his father to pay off K & F's loan with its lender. The K & F assets were not transferred to Frost-Tec, however, so (1) the debtor's father assumed he would step into K & F's shoes and retain a lien on the personal property, and (2) Frost-Tec did not have any rights to the property to pledge to F & M Bank. This came to light in late 2018 when some of the equipment used by Frost-Tec was destroyed, forcing the business to close. Debtor's father and F & M each claimed primary interest in the collateral. Debtor's father took control of the equipment because it was in a building he controlled; the matter is now the subject of a pending declaratory judgment and replevin action. The debtor has surrendered all interest in the equipment and the insurance

claim on the damaged equipment to the bank. The issue remaining is whether the bank's deficiency claim, if any, should be discharged.

The parties agree on the following facts:

1. On November 21, 2019, Joel Frost filed a voluntary petition for relief under Chapter 7.

2. On March 4, 2020, Frost's bankruptcy case was converted to Chapter 13 upon his motion.

3. No Chapter 13 plan has yet been confirmed.

4. Frost has not been granted a discharge in his bankruptcy.

5. F & M Bank is a Nebraska chartered bank with its principal place of business in Nebraska.

6. On or about May 22, 2013, Frost and Jeremy Kearney formed an entity named K & F Welding, LLC ("K & F") for purposes of operating a welding business in the Falls City, Nebraska, area. Frost and Jeremy Kearney were the original members of K & F.

7. On or about November 21, 2013, Frontier Bank (formerly known as Richardson County Bank and Trust) filed a Uniform Commercial Code (UCC) financing statement against all business personal property and equipment of K & F. Frontier Bank subsequently filed additional UCC financing statements against all business personal property and equipment of K & F.

8. Upon information and belief, Frontier Bank provided business financing for K & F on or about November 21, 2013.

9. On or about December 16, 2016, a Certificate of Organization was filed with the State of Nebraska for Frost-Tec Welding, Manufacturing, and Fabrication, LLC ("Frost-Tec"). Frost was identified as the sole owner.

10. On or about January 29, 2018, Frost, acting on behalf of Frost-Tec, initiated a banking relationship with F & M Bank on behalf of Frost-Tec. On that date, Frost signed documents to open an account at F & M Bank for Frost-Tec, a standard business account. On February 16, 2018, Frost-Tec opened a payroll account at F & M Bank.

11. On or about February 16, 2018, Frost initiated a banking relationship with F & M Bank in his personal capacity. On that date, Frost signed documents to open an individual checking account with F & M Bank.

12. During February 2018, representatives of F & M Bank visited the business premises used by Frost-Tec.

13. Frost represented to F & M Bank that F & M Bank could receive a lien on the business assets. Frost states that he does not recall the term "first lien" being discussed. Frost states that at the time the F & M Bank loan was first funded, he believed F & M Bank would have the only lien.

14. On or about May 15, 2018, Frost, acting on behalf of K & F, initiated a banking relationship with F & M Bank. On that date, Frost executed a Certificate and Authority for Banking Transactions for F & M Bank on behalf of K & F. On such documents, Frost was identified as the sole member of K & F.

15. Frost provided a detailed listing of business property and equipment that he represented were the property of Frost-Tec, and which would serve as collateral for loans to be made by F & M Bank.

16. On March 1, 2018, Frost executed a Commercial Security Agreement granting F & M Bank a security interest in all business property of Frost-Tec.

17. On March 1, 2018, and subsequent dates in 2018, Frost-Tec obtained various loans from F & M Bank, ultimately reaching a cumulative total of approximately $170,623.98 owed to F & M Bank, with interest continuing to accrue.

18. On March 7, 2018, F & M Bank filed a UCC financing statement against all business property of Frost-Tec.

19. On October 25, 2018, K & F, Frost-Tec, and Frost executed numerous documents allegedly to provide security interests to Neal Frost (the debtor's father) and K & F. These actions were unknown to F & M Bank at the time. These documents included the following:

    a. A promissory note executed on behalf of K & F and Frost-Tec, signed by Frost on behalf of both, to Neal Frost, jointly promising to pay $600,000 to Neal Frost.

    b. Security agreements executed on behalf of K & F and Frost-Tec, signed by Frost on behalf of both, allegedly granting a security interest to Neal Frost in all personal property of K & F and Frost-Tec.

    c. Personal guaranty of Frost to Neal Frost.

    d. Deed of trust of K & F to Neal Frost regarding certain real estate located in Falls City, Nebraska.

20. On November 1, 2018, Neal Frost filed a UCC financing statement claiming to have a lien on all assets of Frost-Tec.

21. On December 6, 2018, Frost-Tec received its final loan from F & M Bank, for repairs to a welder "to be paid by an insurance settlement". This loan was guaranteed by Frost, as were the other loans to Frost-Tec.

22. On January 15, 2019, Frost provided to F & M Bank a balance sheet for Frost-Tec, signed by Joel Frost, which lists machinery and equipment represented to be the property of Frost-Tec.

23. Frost filed a Chapter 13 petition on March 20, 2019 at Case No. BK19-40095. Frost's Petition was dismissed on November 8, 2019.

24. Frost-Tec filed a Chapter 7 petition on June 28, 2019 at Case No. BK19-41118. Frost-Tec's bankruptcy was closed on November 12, 2019.

25. Neal Frost, Frost-Tec, and K & F were "insiders" of Frost within the meaning of 11 U.S.C. § 101.

26. Frost-Tec's debts to F & M Bank, guaranteed by Frost, consist of the following:

| Account No./Description | Amount |
|---|---|
| 49CL/1995 Caterpillar Forklift | $ 7,442.84 |
| 48CL/Additional Operating Capital | $ 31,376.67 |
| 01CL/Welder Repair | $ 10,201.25 |
| 77CL/Frost-Tec 2018 Operating Expenses | $ 51,808.10 |
| 8621/General Account | $ 21,885.90 |
| 8720/Payroll Account – Overdraft | $ 47,909.22 |
| TOTAL: | $170,623.98 |

The bank relies on § 523(a)(2) of the Bankruptcy Code, which

excepts from discharge debts arising from various forms of fraud. Subparagraph (A) bars discharge of debts arising from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." Subparagraph (B), in turn, bars discharge of debts arising from a materially false "statement . . . respecting the debtor's . . . financial condition" if that statement is "in writing."

*Lamar, Archer & Cofrin, LLP v. Appling*, ___ U.S. ___, 138 S. Ct. 1752, 1758–59 (2018)

The bank seeks to establish the elements of § 523(a)(2)(A), which prohibits the discharge of a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the

extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition[.]"

To exclude such a debt from discharge, the creditor must show:

> that a debtor (1) made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, and which (5) proximately caused the creditor damage. *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014). Exceptions to discharge are to be construed narrowly. *Reshetar Sys., Inc. v. Thompson (In re Thompson)*, 686 F.3d 940, 944 (8th Cir. 2012).

*Hernandez v. General Mills Fed. Credit Union (In re Hernandez)*, 860 F.3d 591, 601-02 (8th Cir. 2017).

The bank alternatively argues that the debt should be excepted under § 523(a)(2)(B). Under that subsection, a creditor must prove, by a preponderance of the evidence, that the debtor obtained money by (1) use of a statement in writing that was materially false; (2) that pertained to his or his business's financial condition; (3) on which the plaintiff reasonably relied; and (4) that the debtor made with the intent to deceive the plaintiff. *Jacobus v. Binns (In re Binns)*, 328 B.R. 126, 129 (B.A.P. 8th Cir. 2005); *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 813 (B.A.P. 8th Cir. 2011).

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The movant bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the non-movant must respond by submitting evidentiary materials that set out specific facts showing the existence of a genuine issue of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011).

At the outset, at least two material factual issues make themselves glaringly apparent: the debtor's intent and the creditor's reliance.

Fraudulent misrepresentation requires that the representation is accompanied by an element of scienter: the maker of the representation must (a) know or believe that the matter is not as he represents it to be, (b) lack confidence in the accuracy of his representation, or (c) know that he does not have the basis for the representation. *Hernandez v. Sulier (In re Sulier)*, 541 B.R. 867, 879 (Bankr. D. Minn. 2015). To amount to fraud, a statement must be made deliberately and intentionally with the intention and purpose of deceiving. *Lindau v. Nelson (In re Nelson)*, 357

- 5 -

B.R. 508, 513 (B.A.P. 8th Cir. 2006). When assessing the debtor's knowledge that the representation was false, the court must consider the debtor's knowledge and experience. *Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (citing *Federal Trade Comm'n v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)). The knowledge requirement can be satisfied with a finding that the debtor recklessly disregarded the truth by making the false representation under circumstances where he should have known it to be false. *Id.*

"The intent element of § 523(a)(2)(A) does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." *Moen*, 238 B.R. at 791 (quoting *Moodie-Yannotti v. Swan (In re Swan)*, 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993)). "Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Id.* (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987)). The intent to deceive will be inferred when the debtor makes a false representation and knows or should know that the statement will induce another to act. *Id.* The key is whether the debtor knew the statement to be false at the time he made it. "Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made." *Nelson*, 357 B.R. at 513.

These factors are difficult to ascertain at the summary judgment stage, as they require an examination of the facts and circumstances of the representations at issue. The debtor testified in his deposition that because F & M Bank required K & F's loan with Frontier Bank to be paid off before agreeing to lend money to Frost-Tec, the debtor's father, Neal Frost, agreed in February or March 2018 to provide the funds for the Frontier Bank pay-off with the understanding the debtor would repay him. He further testified that F & M's representatives were made aware of this during discussions between Frost and F & M about making the initial loan to Frost-Tec.[1] The debtor explained in his deposition that the documents memorializing the arrangement with his father were prepared on March 1st, but were not signed at that time because his father was undergoing cancer treatment at the time. On its face, the evidence does not establish a knowingly false or reckless statement by the debtor.

---

[1] For instance, the debtor described the following conversation, although the timeframe is unclear:

> Q. Did you discuss with any representative of F&M Bank exactly what your arrangement with your father was?
>
> A. Yes, we had talk-- we talked about the fact that with dad buying it out that at some point this money was going to have to be given back or paid back. And said I remember my dad's word right now, "The priority is getting him a line of credit." My father was attending the original beginning meetings with the intent of he was going to have to cosign.

Dep. of Joel Frost, 28:16-25 (Fil. No. 23).

Likewise, the bank must show it justifiably relied[2] on the debtor's alleged misrepresentations. To meet this burden,

> a creditor may rely on a representation of fact even though he might have discovered the falsity of the representation if he had investigated the matter. *Islamov v. Ungar (In re Ungar)*, 633 F.3d 675, 679 (8th Cir. 2011) (citing *Field v. Mans*, 516 U.S. 59, 70-71, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995)). However, creditors may not "turn a blind eye where a patent falsity could be determined by a cursory examination or investigation." *Id.* (quoting *Field*, 516 U.S. at 71, 116 S. Ct. 437) (internal quotations and citations omitted). "In other words, if there are any warning signs . . . in the nature of the transaction, or in the debtor's conduct or statements, the creditor has not justifiably relied on his representation." *Guske v. Guske (In re Guske)*, 243 B.R. 359, 363-64 (8th Cir. BAP 2000). The question of whether reliance is justifiable is subjective and dependent upon the qualities and characteristics of the particular creditor, and the circumstances of the particular case. *In re Ungar*, 633 F.3d at 679. Courts may consider the following factors in determining whether a creditor's reliance was justifiable:
>
>> (1) the parties' previous business dealings; (2) events which might have put the creditor on notice that the representations were not well-founded; (3) whether a simple inquiry or request for additional information might have revealed the misinformation; (4) the course of dealings between the creditor and the debtor; and (5) information commonly known about the particular industry.
>
> *Kassebaum v. Smith (In re Smith)*, 591 B.R. 741, 750 (Bankr. D. Minn. 2018) (quoting *Hernandez v. Sulier (In re Sulier)*, 541 B.R. 867, 879 (Bankr. D. Minn. 2015)). A "victim of fraud is not justified in relying on a representation, and a duty to investigate arises, where the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived." *Hernandez v. Gen. Mills Fed. Credit Union (In re Hernandez)*, 860 F.3d 04 (8th Cir. 2017)."

*Takuski v. Kurtz (In re Kurtz)*, 604 B.R. 549, 559-60 (Bankr. D. Neb. 2019).

In the present case, there are allegations that the bank was aware of the debtor's involvement in both K & F and Frost-Tec and that Frost-Tec was intended to be a restructuring of K & F. There is also evidence the bank was told that Neal Frost would be paying off the K & F obligations to Frontier Bank, but according to both the debtor and the loan officer, they did not discuss the effect of this or how it might alter F & M's security position. The bank officer testified

---

[2] "Justifiable reliance" is the appropriate standard to apply under § 523(a)(2)(A), and is a lower standard than "reasonable reliance," entailing no duty to investigate. *Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)*, 423 B.R. 309, 314 (B.A.P. 8th Cir. 2010) (citing *Field v. Mans*, 516 U.S. 59 (1995)).

in his deposition that he essentially relied on statements from the debtor and the Frost-Tec balance sheet in deciding to make the loan.[3] Whether this reliance was justifiable is a question of fact.

Neither party focused their arguments on § 523(a)(2)(B) (a materially false statement in writing regarding the debtor's or an insider's financial condition), but as that subsection also requires findings of intent and reliance, the same deficiencies exist. Because these questions of fact remain, summary judgment is not warranted.

IT IS ORDERED: The plaintiff's motion for summary judgment (Fil. No. 14) is denied.

DATED: July 7, 2020.

BY THE COURT:

/s/Thomas L. Saladino
Chief Judge

Notice given by the Court to:
   *Matthew V. Rusch
   John D. Rouse
   U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.

---

[3] For example,

> Q. Why did the bank lend money to somebody, to an entity, with a negative net worth?
>
> A. Well, personally, he had some. The, the --we're a small town bank; we help each other out . Do I make loans that always make sense all the time? No. But you got to trust somebody's word, and when somebody, you feel you can trust somebody -- and at the time, we were dealing with a small amount – we helped a guy out. Probably not the right decision, hindsight, but –

Dep. of Derrick Leyden, 49:7-16 (Fil. No. 15).

> Q. What due diligence did the bank do to insure that Joel Frost was the owner of all of this equipment?
>
> A. We -- I mean, there was discussions with him; he presented the balance sheet with those assets on it and signed the balance sheet that attested that it is correct.

*Id.* at 56:10-15.